IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAETEC COMMUNICATIONS, INC.,      :        CIVIL ACTION
et al.                            :
                                  :
        v.                        :
                                  :
MCI COMMUNICATIONS SERVICES,      :
INC. D/B/A VERIZON BUSINESS       :
SERVICES, et al.                  :        NO. 09-1639


MEMORANDUM

Dalzell, J.                                    April 26, 2010

        Plaintiffs[1] have brought this action against defendants

MCI Communications Services, Inc., d/b/a Verizon Business

Services and Verizon Global Networks, Inc. (collectively,

"Verizon"). Specifically, PAETEC claims that: (1) Verizon failed

to pay PAETEC for telecommunications charges under PAETEC's

federal tariffs in violation of federal law, (2) Verizon has

failed to pay PAETEC for telecommunications charges under

PAETEC's state tariffs in violation of state law, (3) Verizon was

unjustly enriched, and defendants should pay at least (4) quantum

meruit. PAETEC also seeks a declaratory judgment that it

_____

[1]PAETEC Communications, Inc., PAETEC Communications of Virginia,
Inc., US LEC Communications Inc d/b/a PAETEC Business Services,
US LEC of Pennsylvania LLC d/b/a PAETEC Business Services, US LEC
of Virginia LLC d/b/a PAETEC Business Services, US LEC of
Maryland LLC d/b/a PAETEC Business Services, US LEC of Alabama
LLC d/b/a PAETEC Business Services, US LEC of Georgia LLC d/b/a
PAETEC Business Services, US LEC of South Carolina d/b/a PAETEC
Business Services, and US LEC of Tennessee Inc. d/b/a PAETEC
Business Services (collectively, "PAETEC").

lawfully assessed, and may continue to assess, the switched access charges at issue.

Verizon counterclaims that PAETEC's charges were in excess of those permitted under federal law and the terms of its own federal tariff. Verizon seeks a declaratory judgment that it is not obliged to pay PAETEC under PAETEC's federal tariff for the amounts Verizon has disputed.

PAETEC has moved for summary judgment to require Verizon to pay all tariff charges or, if we deem the tariffs to be unlawful, to require Verizon to at least pay the benchmark rate or the reasonable value of its access services. Verizon has moved for partial summary judgment on liability.

I. **Factual Background**[2]

PAETEC is a landline telephone company that provides local telephone service to consumers and businesses. Stip. at ¶ 1. A telephone carrier such as PAETEC that provides local exchange service is known as a local exchange carrier ("LEC"). Stip. at ¶ 2. A carrier that transmits long-distance calls between the networks of two LECS is commonly referred to as an "interexchange carrier" or "IXC". Stip. at ¶ 3. Verizon is, among other things, an IXC. Stip. at ¶ 8. In the

_____

[2]The parties submitted a joint stipulation of facts ("Stip.") on February 23, 2010.

telecommunications industry, switched access service (or access service) allows an IXC to access an LEC's network in order to "originate or terminate"[3] long-distance calls to and from "end-users" (parties who make or receive telephone calls).  Stip. at ¶ 4.  PAETEC permits long-distance carriers to access its network in order to originate or terminate long-distance telephone calls involving PAETEC's end-user customers.  Stip. at ¶ 5.

There are two types of LECs.  The original, established carriers, who existed before Congress enacted the Telecommunications Act of 1996 ("TCA" or the "1996 Act")(which amended the Federal Communications Act of 1934), are known as incumbent LECs ("ILECs").  LECs who entered the marketplace after the 1996 Act took effect compete with ILECs and each other and are known as competitive LECs ("CLECs").  Stip. at ¶ 6.  PAETEC is a CLEC.  Stip. at ¶ 7.  ILECs and CLECs compete for end-user customers.  Stip. at ¶ 94.

For the period at issue -- roughly, from the middle of 2006 until now -- Verizon delivered traffic to PAETEC end-users over PAETEC's network, or received traffic from PAETEC's end-users over PAETEC's network.  PAETEC permitted Verizon to access its network to complete long-distance calls to PAETEC's

_____

[3] Though this is the locution the parties use, palpably "terminate" must mean <u>complete</u>, as in "one completes the call."

end-user customers, and to originate long distance calls that PAETEC's end-user customers place. Stip. at ¶ 12. The rates, terms, and conditions for the interstate switched access services PAETEC offers (long distance calls that originate in one state and terminate in another state) are contained in PATEC's FCC Tariff No. 3 filed with the FCC. Stip. at ¶ 13. The rates, terms, and conditions on which local exchange carriers offer intrastate switched access services are contained in tariffs filed with the relevant state public utility commissions. Stip. at ¶ 14.

The traffic at issue in this case -- for which Verizon has disputed PAETEC's invoices -- is limited to interstate traffic where the long distance call is destined for, or originated by, a PAETEC end-user customer. Verizon also withheld payment of invoices for intrastate switched access, but it did so solely to recover what it viewed as prior overpayments to PAETEC for PAETEC's invoices for interstate switched access service. Verizon does not dispute the merits of any of PAETEC's intrastate charges. Stip. at ¶ 15.

Unlike an ILEC, which typically uses a "hub and spoke" arrangement of switches that serves a relatively smaller geographic area, PAETEC uses a single switch that branches out both in long loops (which connect the CLEC's switch to end-users)

4

to end-users over a wide geographic area, and also branches out in long lines ("trunks") to multiple ILEC tandems, to deliver access services to IXCs. Stip. at ¶ 43. PAETEC's network serves a geographically dispersed and specialized customer base (medium-sized businesses). Stip. at ¶ 44. Compared to a typical ILEC network, PAETEC uses fewer switches and longer transport lines to serve larger geographic areas. A single PAETEC switch connects to end-users spread over a wider geographic area than an ILEC end-office switch serving the same general area. Stip. at ¶ 45.

PAETEC does not own or operate any tandem switches (which route calls between end-office switches and do not connect directly to end-user customers' premises), and when Verizon routed the traffic at issue to PAETEC, although some of the traffic went through an LEC's tandem switch, PAETEC did not switch that traffic twice before delivering it to a PAETEC end-user customer. Stip. at ¶¶ 29, 46-47, Def. Ans. and Counterclaim at ¶ 27. When Verizon delivers traffic to PAETEC over a direct connection, the traffic is not routed through a tandem switch before PAETEC delivers the traffic to its end-user customers. Stip. at ¶ 49.

PAETEC's FCC Tariff No. 3 sets forth the rates, terms, and conditions for the interstate switched access services that

PAETEC offers.  From July 5, 2006 to the present, Rate Attachment

B to PAETEC's FCC Tariff No. 3 sets forth rates for Switched

Access Service ("SWAS") and Switched Access Service (Direct

Connect)("SWAS-DC").  Stip. at ¶ 63.  In or about June of 2006,

PAETEC concluded that the "CLEC Benchmark" allowed a CLEC to

charge a rate for interstate switched access service that was

equal to the sum of all of the applicable ILEC rate elements,

including, among other things, tandem switching.  Stip. at ¶ 65.

     The "CLEC Benchmark" is the maximum permissible

tariffed rate that can be charged under FCC rules for CLEC

interstate switched access service.  Stip. at ¶ 112.  PAETEC

amended its FCC Tariff No. 3, effective July of 2006 (the "July

2006 Amendment"), the effect of which was to charge Verizon a

composite, aggregate rate for SWAS and SWAS-DC services.  The

SWAS rate applied if PAETEC provided an IXC access to its local

network through an indirect connection (by routing through

another LEC's tandem switch); the SWAS-DC rate applied when the

customer or IXC directly connected to PAETEC's switch.  Stip. at

¶ 68.

     Although the July 2006 Amendment's composite rate did

not include a charge for "tandem switching", when PAETEC amended

the tariff again the next month, it increased the composite rates

for SWAS and SWAS-DC service to include the price of the tandem

switching rate element.  Stip. at ¶¶ 69, 74-75.  Thus, PAETEC

increased its SWAS-DC rates so that they equalled the sum of the

ILECs' "local switching"[4] rate element plus the ILECs' "tandem

switching" rate element.  Stip. at ¶ 75.  Since July 5, 2006,

PAETEC has charged its SWAS rate for situations where the IXC

connects to PAETEC's switch through an ILEC tandem.  Since July

5, 2006, PAETEC has charged its SWAS-DC rate in situations where

the IXC directly connects to PAETEC's switch without connecting

through an ILEC tandem.  Stip. at ¶ 76.  No PAETEC invoice for

interstate switched access services where PAETEC's end-users

received or originated the calls, and issued to Verizon after

PAETEC's July 2006 Amendment, contained a separate charge for the

tandem switching.  Stip. at ¶ 77.  Since the July 2006 Amendment,

PAETEC has billed a composite aggregate charge for SWAS and

SWAS-DC without breaking out the individual rate elements.  Stip.

at ¶ 78.  All of the calls at issue here were routed to PAETEC's

end-user customers over a single PAETEC switch.  Stip. at ¶¶ 11-

12, 43, 46-49.  To the extent that a second LEC switch was

involved in routing the calls, that switch was a tandem switch

owned by an ILEC.  Id.

This language has been in PAETEC's tariff in its

current form since April 25, 2006:

---

[4]This term is synonymous with "end-office switching".

All bills are presumed accurate, and
shall be binding on the Customer, and
such Customer shall be deemed to have
waived the right to dispute the charges
unless written notice of the disputed
charge(s) is received by the Company
within 90 days of the invoice date
listed on the bill.  To be effective,
the written notice of the dispute must
contain sufficient information to enable
the Company to investigate the dispute,
including the account number under which
the bill has been rendered, the date of
the bill, and the specific items on the
bill being disputed.

Stip. at ¶ 97.  In questioning PAETEC's invoices and withholding

payment, Verizon disputes whether the amount PAETEC charged for

interstate switched access services was in compliance with what

Verizon calculated should have been charged under the CLEC

Benchmark.  Stip. at ¶ 102.  The Network Financial Operations

Group at Verizon has continuously existed since January of 2006,

and has created, and keeps up to date, charts that contain the

composite rate that, pursuant to Verizon's calculations, is the

maximum a CLEC can tariff consistent with the applicable FCC

regulations.  Verizon then compares that calculated rate with the

rate a CLEC, like PAETEC, charged, to determine whether the

CLEC's rate exceeds the maximum rate a CLEC can tariff.  Stip. at

¶ 104.

On October 10, 2006, Verizon raised questions about

PAETEC's SWAS rates.  Verizon did not file a dispute with PAETEC

at that time.  Stip. at ¶ 105.  PAETEC responded the next day.
Stip. at ¶ 106.  Between July 2006 and May 2008, Verizon paid
PAETEC's invoices for its SWAS and SWAS-DC rates.  Stip. at ¶
110.  In the course of discovery, PAETEC was unable to determine,
and could find no evidence of, whether it provided Verizon with a
spreadsheet prior to this litigation showing how PAETEC
calculated the SWAS or SWAS-DC rates it charged Verizon starting
in July of 2006.  Stip. at ¶ 114.

    In mid-2008, Verizon decided to dispute the rate
differential between the amount PAETEC charged and the amount
that Verizon calculated should have been charged under the CLEC
Benchmark.  Stip. at ¶ 115.  Verizon first disputed PAETEC's
charges for interstate switched access service in June of 2008
when it disputed charges related to Billing Account Number
("BAN") 4716D6963.  This particular BAN covered charges PAETEC
assessed for calls delivered to (or originated by) PAETEC
customers in Maryland.  Stip. at ¶ 116.  In determining whether
to dispute a CLEC's invoice, Verizon looks to see whether the
CLEC routes the traffic through one or two switches before
delivering the traffic to the CLEC's end-user where the CLEC's
rate includes an amount equal to that which an ILEC would charge
for tandem switching.  Stip. at ¶ 118.

Verizon argues that PAETEC has been charging it for tandem switching and transport between a tandem switch and PAETEC's end-office switching, even though PAETEC is not performing tandem switching and, in some cases, is not performing any (or all) of the transport. Counterclaim at ¶ 21. Verizon further alleges that even if PAETEC were providing the interstate switched access services for which it purports to bill, PAETEC is charging more for those services than is allowed under the terms of its federal tariff and the applicable FCC rules capping the tariffed interstate access charge rates of CLECs like PAETEC. Id. at ¶ 23.

PAETEC contends that the FCC allows CLECs to charge for the complete access service without regard to the individual components of the connections. PAETEC claims that the amount that Verizon has withheld in interstate and intrastate switched access tariffs is $4.9 million and counting. Compl. at ¶ 31. In disputing PAETEC's invoices, Verizon calculated the dollar value of the pending dispute as the difference between what PAETEC charged for interstate switched access services and what Verizon calculated PAETEC was permitted to charge under the CLEC Benchmark. Stip. at ¶ 57. Verizon claims that PAETEC has overcharged it by more than $5.3 million. Counterclaim at ¶ 24.

The crux of this case turns on whether the FCC allows CLECs to charge for the equivalent of tandem switching even though CLECs are not using their own tandem switches to connect IXCs to their end-users, or, in the case of direct connect access services, using no tandem switch at all.

PAETEC argues in its motion for summary judgment that (1) Verizon should have to pay all tariff charges up to the date of an adverse decision because PAETEC's tariffs are conclusively "deemed lawful", (2) PAETEC is entitled to summary judgment on all claims because PAETEC's tariff complies with the Benchmark, (3) PAETEC is entitled either to the Benchmark rate or the reasonable value of its access services, (4) if this Court determines there are unresolved telecommunications policy issues concerning calculation of the Benchmark, then we should sever and refer the issue of the prospective application of PAETEC's tariff to the original jurisdiction of the FCC, but still grant PAETEC final summary judgment applying PAETEC's tariff until an adverse decision, if any, by the FCC, and (5) that Verizon's claims are largely time-barred or waived under applicable law.

Verizon contends in its motion for partial summary judgment that (1) under federal law, a CLEC that routes its end-user customers' calls through a single switch cannot tariff a rate that includes both end-office and tandem switching charges,

11

(2) Verizon is entitled to partial summary judgment on liability

because PAETEC's overcharges violate its tariff and federal law,

and (3) Verizon is entitled to partial summary judgment because

PAETEC had no lawful tariff on file with the FCC and charged for

services not in its tariff.

## II. **Analysis**[5]

---

[5] Summary judgment is appropriate when the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant party is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c)(2).  On cross-motions for summary
judgment, we will construe the facts and draw inferences "in
favor of the party against whom the motion under consideration is
made." Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir.
2008)(internal citations and quotation marks omitted).  Whenever
a factual issue arises which cannot be resolved without a
credibility determination, the Court must credit the non-moving
party's evidence over that presented by the moving party.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The moving party bears the initial burden of proving that
there is no genuine issue of material fact in dispute.
Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 585 (1986). Once the moving party carries this burden, the
nonmoving party must "come forward with 'specific facts showing
there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R.
Civ. P. 56(e)).  The non-moving party must present something more
than mere allegations, general denials, vague statements, or
suspicions.  Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884,
890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676
F.2d 965, 969 (3d Cir. 1982).  It is not enough to discredit the
moving party's evidence, the non-moving party is also required to
"present affirmative evidence in order to defeat a properly
supported motion for summary judgment." Liberty Lobby, 477 U.S.
at 257.  A proper motion for summary judgment will not be
defeated by merely colorable evidence or evidence that is not
significantly probative.  See Liberty Lobby, 477 U.S. at 249-50.
"[T]he burden on the moving party may be discharged by
'showing'...that there is an absence of evidence to support the
nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317,
325 (1986).

We are called upon to interpret the FCC's Benchmark rate and whether PAETEC has complied with it. If we find that any part of the FCC's guidance is unclear, that portion of the case will be referred to the FCC's original jurisdiction for further clarification. First, however, we must address a few threshold issues.

## A. PAETEC's Tariff Is Not Void <u>Ab</u> <u>Initio</u>

Verizon contends that PAETEC's cross-reference to 47 C.F.R. § 61.26, which its tariff contained until November of 2008, violated 47 C.F.R. § 61.74(a), thereby rendering PAETEC's tariff void <u>ab</u> <u>initio</u>. Section 61.74(a) dictates that "no tariff publication filed with the Commission may make reference to any other tariff publication or to any other document or instrument." PAETEC's FCC Tariff No. 3 § 3.1 contains the following clause: "Notwithstanding any other provision of this tariff, the rate for Switched Access Service shall equal the maximum rate permitted under 47 C.F.R. § 61.26." Stip. Ex. 7.

We find that violations of 47 C.F.R. § 61.74(a) do not render the tariff void <u>ab</u> <u>initio</u>, but, rather, "[f]ailure to comply with any provisions of these rules <u>may</u> be grounds for rejection of the non-complying publication, a determination that it is unlawful or other action." 47 C.F.R. § 61.1(b)(emphasis added). <u>Global NAPS, Inc. V. FCC</u>, 247 F.3d 252 (3d Cir. 2001),

upon which Verizon relies, is inapposite.  There, the FCC had already declared the tariff void _ab_ _initio_ because it impermissibly cross-referenced an interconnection agreement between the parties, and our Court of Appeals upheld the agency's ruling.  Here, the FCC has not rejected PAETEC's tariff.  Indeed, the FCC has made no adverse determination with regard to PAETEC's tariff, and we find no support for the proposition that a "cross-reference" to the governing law should render a tariff void _ab_ _initio_.

Verizon also claims that, because PAETEC's federal tariff defined SWAS as a service that "provides for the use of Company switching equipment and network services for connecting an End User's premises with a Customer point of presence," and defined the "Company" as PAETEC, the "Customer" as a long-distance carrier, and the "End User" as PAETEC's end-user customers, the tariff was unclear and charged for services not rendered -- specifically, tandem switching.[6]  Verizon contends that PAETEC never solely provided for the use of company switching equipment and network services because PAETEC routed

_____

[6]PAETEC modified its tariff in November of 2009.  Section 3.2.1 now reads: "SWAS provides for the use of Company switching equipment and network services to provide Switched Access Service where the Customer point of presence is connected indirectly to PAETEC's network through a tandem switch or functionally similar equipment controlled by a third party such as an incumbent local exchange carrier."  Stip. Ex. 17.

the calls through another ILEC's tandem switch whenever it provided SWAS services. Def.'s Mem. of Law in Supp. of Part. Mot. for S.J. ("D.M.S.J.") at 26-27. Because we find below that the FCC has carved out an exception for CLECs using another LEC's tandem switch, and that CLECs may charge a composite rate that includes the equivalent of the tandem switching rate element in its SWAS charges, we find that PAETEC's tariff was not inappropriate or unclear.

### B. The Benchmark

The Benchmark is codified in 47 C.F.R. § 61.26. Section 61.26(a)(3) defines interstate switched exchange access service as including "the functional equivalent of the ILEC interstate exchange access services typically associated with following rate elements: carrier common line (originating); carrier common line (terminating); local end office switching; interconnection charge; information surcharge; tandem switched transport termination (fixed); tandem switched transport facility (per mile); <u>tandem switching</u>" (emphasis added).

PAETEC argues that the Benchmark permits CLECs to charge the full amount that ILECs charge for access service, including the ILEC tandem switching rate element, even if the CLEC is using a tandem switch that is not its own, or is using some access method that entirely circumvents the need for a

tandem switch.  Pl.'s Mem. of Law in Sup. of M.S.J. ("P.M.S.J.")
at 24; Pl.'s Resp. to Def.'s Mot. for Part. S.J. ("Pl. Resp.") at
3.  Verizon responds that a CLEC may only charge for the tandem
switching rate element when it performs both functions -- that
is, both tandem (switch-to-switch) and end-office (switch-to-end-
user-customer) switching  -- using two separate switches, and
where it actually owns both switches.  D.M.S.J. at 14.

        Although there is only one "benchmark" codified in the
TCA, the FCC differentiates between SWAS and SWAS-DC services.
SWAS service is an indirect connection through an ILEC tandem
(which then flows through to a second, end-office switch), and
SWAS-DC service is a direct connection to a CLEC's end-users
through only one switch (the end-office switch), Stip. at ¶ 68;
Ex. 8.  PAETEC claims that its SWAS-DC service provides access to
the same geographic area that historically could only be served
by two switches (a tandem switch and an end-office switch).
P.M.S.J. at 8.  PAETEC also claims that the FCC has ruled that
CLECs may charge for the functional equivalent of tandem
switching for both SWAS and SWAS-DC services, and therefore it
may lawfully charge the same rate for both.  Verizon contends
that the FCC has ruled that CLECs may only charge by the switch,
PAETEC has only been using one switch (that it owns) for each of
these services, and therefore PAETEC is charging too much when it

charges for both.  Based on the FCC's clarifications, we see a third possibility which is that CLECs could charge by the switch as long as the call is being routed through both a tandem switch and a local switch, regardless of who owns the tandem switch; CLECs could on this alternative charge for both switches.

The issue now is (1) whether PAETEC can include in its SWAS charge a tandem switching element even though it is providing the service through another ILEC's tandem switch, and (2) whether PAETEC can charge for the equivalent of two switches-worth of service even though, while it may be servicing the same geographic area as two switches, it is only using one physical switch for its SWAS-DC access services.

### 1.    The SWAS Benchmark Rate

In the FCC's Seventh Report[7], the Agency notes that "CLECs should not be deprived of revenue streams available to the incumbent monopolists with which they compete...by moving the CLEC access tariffs to the competing ILEC rate, we intend to permit CLECs to receive revenues equivalent to those the ILECs receive <u>from IXCs</u>, whether they are expressed as per-minute or flat-rate charges."  Seventh Report at ¶ 54 (internal quotation

---

[7]Seventh Report and Order and Further Notice of Proposed Rulemaking, Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exchange Carriers, 16 FCC Rcd 9923 (2001)("Seventh Report").

marks and citations omitted).  The FCC clarified that its "benchmark rate for CLEC switched access does not require any particular rate elements or rate structure...so long as the composite rate does not exceed the benchmark." Id. at ¶ 55.

In the FCC's Eighth Report[8], in response to Qwest Communications International Inc.'s request for clarification[9] that a CLEC "may tariff its access service charges at the total switched access rate of the competing ILEC only to the extent the CLEC itself is providing each of the services necessary to originate and terminate interexchange calls," the FCC stated:

> When a competitive LEC originates or terminates traffic to its own end-users, it is providing the functional equivalent of those services, even if the call is routed from the competitive LEC to the IXC through an incumbent LEC tandem.  Consequently, because there may be situations when a competitive LEC does not provide the entire connection between the end-user and the IXC, but is nevertheless providing the functional equivalent of the incumbent LEC's interstate exchange access services, we deny Qwest's petition.

---

[8]Eighth Report and Order and Fifth Order on Reconsideration, Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exchange Carriers; Petition of Z-Tel Communications, Inc. for Temporary Waiver of Commission Rule 61.26(d) to Facilitate Deployment of Competitive Service in Certain Metropolitan Statistical Areas, 19 FCC Rcd 9108 (2004)("Eighth Report").

[9]Qwest Communications Corp. v. Farmers and Merchants Mutual Telephone Co., 22 FCC Rcd. 17973 (2007).

Eighth Report at ¶ 13.

Thus, the FCC held that where the calls are being routed through two switches, even if one of the switches belongs to an ILEC, the CLEC is providing the functional equivalent of the full switched access services and may charge the full benchmark rate. The FCC noted that when reading paragraph 55 of the Seventh Report "in conjunction with the definition contained in section 61.26(a)(3), we think the two lists of elements described in paragraph 55 were intended to illustrate what might be considered the 'functional equivalent' of incumbent LEC access services, rather than mandating the provision of a particular set of services."[10]  Eighth Report at ¶ 13 n.48.  The FCC continued: "a competitive LEC that provides access to its own end-users is providing the functional equivalent of the services associated with the rate elements listed in section 61.26(a)(3) and therefore is entitled to the full benchmark rate."  Id. at ¶ 15.

---

[10]Paragraph 55 reads, in part, "there are certain basic services that make up interstate switched access service offered by most carriers. Switched access service typically entails: (1) a connection between the caller and the local switch, (2) a connection between the LEC switch and the serving wire center (often referred to as "interoffice transport"), and (3) an entrance facility which connects the serving wire center and the long distance company's point of presence. Using traditional ILEC nomenclature, it appears that most CLECs seek compensation for the same basic elements, however precisely named: (1) common line charges; (2) local switching; and (3) transport. The only requirement is that the aggregate charge for these services, however described in their tariffs, cannot exceed our benchmark." Seventh Report at ¶ 55.

We agree with PAETEC that the FCC intended its analysis of the Qwest request for clarification to apply both to the transitional rates and to the final benchmark rate. Id. at ¶ 19. Thus, we find that where a CLEC routes calls to its end-users through a tandem switch, whether it owns that tandem switch or not, it may charge the full benchmark rate for that service. PAETEC has not violated the FCC's benchmark by charging Verizon for the functional equivalent of the tandem switching rate and the end-office switching rate for its SWAS access services.

### 2.    The SWAS-DC Benchmark Rate

With regard to the SWAS-DC access service, which only involves one switch but may cover a geographic area equivalent to the area that can be served by a tandem switch, PAETEC claims that the FCC has ruled that it can charge the equivalent of a tandem switching element for this service as well because "it is the function of providing access that matters."  P.M.S.J. at 31. Verizon refutes this by pointing to the FCC's response to NewSouth's request for clarification in the Eighth Report.[11]

---

[11]PAETEC argues the <u>NewSouth</u> and <u>Cox</u> clarifications cut in its favor, but that if we find that those clarifications do not bolster its position, then the clarifications must be inconsistent with the FCC's previous orders and therefore do not possess the force of law because the FCC did not comply with the Administrative Procedure Act when it failed to engage in the notice and comment rulemaking required under the Act.  We do not find that the clarifications are inconsistent with the FCC's prior rulings, and, regardless, we agree with Verizon that we do

NewSouth argued that CLECs should be permitted to charge for all of the competing ILEC access elements (including tandem switching and end-office switching) if its switch serves a geographic area comparable to the competing ILEC's tandem switch in an analogous fashion to the way that tandem functionality was applied in the "reciprocal compensation" context.[12] Eighth Report at ¶ 20. The FCC explicitly rejected NewSouth's proposed clarification. Instead, the FCC clarified that its long-standing policy has been to allow ILECs to charge only for those elements of service that it actually provides, and "if an incumbent LEC switch is capable of performing both tandem and end office

---

not have jurisdiction over PAETEC's APA claims, which, pursuant to 28 U.S.C. § 2344, are subject only to the original jurisdiction of our Court of Appeals.

[12]"Reciprocal compensation" governs the exchange of local traffic between two LECs. 47 U.S.C. § 251(b)(5). In considering reciprocal compensation, our Court of Appeals noted that the FCC had acknowledged the special situation that occurs when a competing carrier's newer technology does not precisely replicate the traditional "tandem switch" routing. SBC, Inc. v. FCC, 414 F.3d 486, 491 (3d Cir. 2005). "Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate. The FCC thus mandated an inquiry into the geographic area served in determining the appropriate compensation rate in some circumstances that may involve tandem switching even though the state of the competing carrier's technology might not use tandem switching to complete a given call." Id. at 492 (citing the FCC's Local Competition Order, 11 FCC Rcd 15499, 16042 (¶ 1090)(1996))(internal citations omitted).

functions,[13] the applicable switching rate should reflect only the function(s) actually provided to the IXC.  We believe that a similar policy should apply to competitive LECs."  Id. at ¶ 21. The FCC continued that the ILEC switching rate encompasses the end-office switching rate when a CLEC originates or terminates calls to end-users and the tandem switching rate when a CLEC passes calls between two other carriers.  Id.

Supporting our finding that CLECs may charge for tandem switching even when they use an ILEC's tandem switch, the FCC clarified that "[c]ompetitive LECs also have, and always had, the ability to charge for common transport when they provide it, including when they subtend an incumbent LEC tandem switch. Competitive LECs that impose such charges should calculate the rate in a manner that reasonably approximates the competing incumbent LEC rate."  Id.

---

[13]Some ILEC switches (known as Class 4/5 switches) can perform both a tandem switching function and an end-office switching function within the same physical switch.  Stip. at ¶ 30.  The FCC held that "[t]he Tandem Switching rate will not apply to access minutes that originate or terminate at the end office part of a Class 4/5 switch."  Eighth Report at ¶ 21, n.71 (internal quotations marks and citations omitted).

In the Cox Clarification Order,[14] the FCC reiterated its position that CLECs may charge the end-office switching rate when they originate or terminate calls to end-users, and the tandem switching rate when they pass calls between two other carriers, and that when a CLEC performs both functions, it may charge for both. Stip. Ex. 6. The FCC clarified that this decision is based on the "assumption that a Competitive LEC will permit an IXC to install direct trunking from the IXC's point of presence to the competitive LEC's end office, thereby bypassing any tandem function. So long as an IXC may elect to direct trunk to the competitive LEC end offices, and thereby avoid the tandem switching function and associated charges, there should be limited incentive for competitive LECs to route calls unnecessarily through multiple switches." Id.

PAETEC admits that it set the composite rate for SWAS-DC (which uses direct trunking) to equal the combined dollar values of the ILEC local switching and tandem switching elements' rates.[15] P.M.S.J. at 11. The FCC has clearly stated that the

---

[14]Order, Access Charge Reform; PrarieWaive Telecommunications, Inc. Petition for Waiver of Sections 61.26(b) and (c) or in the Alternative, Section 61.26(b)(6) of the Commission's Rules; SouthEast Telephone, Inc. Petition for Waiver of Section 61.26(a)(6) of the Commission's Rules; Cox Communications, Inc. Petition for Clarification or Reconsideration, 23 FCC Rcd. 2556 (2008)("Cox Clarification Order").
[15]PAETEC argues that the nature of the CLEC network differs in significant ways from the ILEC networks, that these differences are not necessarily captured in the FCC telecommunications

geographic area analysis does not apply to the direct trunking context and therefore PAETEC has been charging above the benchmark rate for its SWAS-DC access service.

## C. The 90-Day Dispute Resolution Provision

PAETEC claims that most of Verizon's claims fail because PAETEC's tariff contains a 90-day waiver provision in which any charge disputes must be submitted within 90 days of receiving the invoice.  Verizon claims that PAETEC cannot assert this defense because of issue preclusion.

The issue of PAETEC's 90-day dispute resolution provision arose previously in the Eastern District of Virginia. In that case,  MCI Worldcom Network Service, Inc. v. PAETEC Communications, Inc., No. 04-1479, 2005 WL 2145499, at *5 ( E.D. Va. Aug. 31, 2005), the court issued an order wherein it found that the 90-day dispute resolution provision in PAETEC's tariff could not preëmpt the federal statute of limitations in the context of a tariff because the terms of a tariff are not negotiated like the terms of a contract.  If a term in the tariff could supersede the statute of limitations, it would mean that a carrier could "unilaterally void federally codified consumer

_____

regulations, and that the SWAS-DC charge may fall into this category.  Id. at 8.  P.M.S.J. at 7.  This is not something we can decide because it is reserved in the first instance for the FCC.

protections simply by filing a tariff." <u>MCI WorldCom Network</u>
<u>Servs., Inc. V. PAETEC Communications, Inc.</u>, No. 04-1479, Slip.
Op. at 2 (E.D. Va. Mar. 16, 2005)(order denying motion for
partial summary judgment).  The Fourth Circuit affirmed.  <u>MCI</u>
<u>Worldcom Network Service, Inc. v. PAETEC Communications, Inc.</u>,
204 F. App'x 271, 272 (4th Cir. 2006).

     Issue preclusion applies when "(1) the issue sought to
be precluded [is] the same as that involved in the prior action;
(2) that issue [was] actually litigated; (3) it [was] determined
by a final and valid judgment; and (4) the determination [was]
essential to the prior judgment." <u>Peloro v. United States</u>, 488
F.3d 163, 175 (3d Cir. 2007)(internal quotation marks omitted).
We apply federal common law principles of issue preclusion
because we are examining the issue preclusive effect of a prior
federal court action.  <u>Id.</u> at 175 n.11.  Under the modern
doctrine of non-mutual issue preclusion, a litigant may also be
estopped from advancing a position that it has presented and lost
in a prior proceeding against a different adversary.  <u>Id.</u>

     This was indeed the same issue that was addressed in
the prior Virginia action.  The issue was actually litigated (and
appealed), was determined by a final and valid judgment, and was
essential to the prior judgment.  PAETEC Communications, Inc.,
was the only one of the current plaintiffs involved in that prior

action, but we find that there is privity between the rest of the
plaintiffs here and PAETEC Communications, Inc.  In any event,
PAETEC does not dispute Verizon's allegations of privity.
Therefore, PAETEC is collaterally estopped from claiming that the
90-day dispute provision in its tariff bars Verizon's claims.
And even if we did not find that PAETEC was estopped from
asserting this defense, we would find that the Fourth Circuit's
ruling on this matter was persuasive.

### D.    The Voluntary Payment Doctrine

PAETEC also claims that Verizon's claims for refunds
fail because of the voluntary payment doctrine, which dictates
that money deliberately and voluntarily paid, with knowledge or
means of knowledge of the material facts and without fraud or
duress, even if paid under a mistake of law as to the obligation
to pay, cannot be recovered back.

This issue was also addressed in <u>MCI Worldcom Network
Service, Inc. v. PAETEC Communications, Inc.</u>, No. 04-1479, 2005
WL 2145499, at *5 ( E.D. Va. Aug. 31, 2005) and affirmed on
appeal.  The district court found that the filed rate doctrine
bars equitable relief in this context.  The filed rate doctrine
prohibits a carrier from collecting charges for services that are
not described in its tariff.  <u>Amer. Tel. & Tel. Co. v. Central
Office Tel, Inc.</u>, 524 U.S. 214, 222 (1998).  The FCC has carved

out an exception for CLECs that make use of an ILEC's tandem switch, but made no such exception for the connection that CLECs may provide with direct trunking.

PAETEC admits that it calculated the rate for SWAS-DC to be the combined dollar amounts of the ILEC local switching and tandem switching elements, and this is not permissible under the filed rate doctrine. PAETEC based its arguments before the Eastern District of Virginia and the Fourth Circuit on Virginia law and here they base their argument on Pennsylvania law. But the principle is the same. We find that PAETEC's voluntary payment argument has no merit.

### E. The Statute of Limitations

Because we find in favor of PAETEC with respect to its SWAS access charges, the following statute of limitations analysis will only apply to PAETEC's SWAS-DC access charges. PAETEC admits that it set the composite rate for SWAS-DC to equal the combined dollar values of the ILEC local switching and tandem switching elements' rates effective August 2, 2006. P.M.S.J. at 11; Stip. at ¶¶ 73-74.

Verizon argues that its counterclaims are compulsory, i.e., they arise out of the same transactions as the original claim and therefore they are treated for statute of limitations purposes as having been filed on April 17, 2009, the day PAETEC

filed its complaint.  The rule regarding compulsory counterclaims, however, only tolls the statute of limitations if the lawsuit itself was brought within the limitations period. "[I]f defendant's claim already is barred when plaintiff brings suit, the notion of tolling the statute is inapplicable and the fact that the tardily asserted claim is a compulsory counterclaim does not serve to revive defendant's right to assert it." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1419 (2d ed. 2010).  We must therefore still determine whether PAETEC brought this action within Verizon's limitations period.

Verizon argues that until November 7, 2008, PAETEC's tariff stated that its SWAS-DC rate would equal the maximum rate allowed under the FCC's benchmark.  D.M.P.S.J. at 17.  We have held that PAETEC, when it calculated its composite SWAS-DC rate as the tandem switching rate plus the end-office switching rate, charged a rate in excess of the maximum rate allowed for its SWAS-DC charges.  Thus, Verizon's claims -- that until November 7, 2008 (when PAETEC deleted the "notwithstanding" clause from its tariff) PAETEC charged in excess of the amount it said it would in its tariff -- are, in essence, claims for overcharges.

47 U.S.C. § 415(c) sets the applicable statute of limitations for claims of overcharges.  Section 415(c) states,

"For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues, and not after...except that if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice."

Verizon claims that it began notifying PAETEC of its overcharge claims in 2008, but it is not possible for us to tell from the evidence provided which disputes related to the SWAS charges and which related to the SWAS-DC charges. What we know for sure, however, is that Verizon asserts that it was overcharged between April 17, 2007 and November 7, 2008. Those claims are therefore timely. For the period between August 2, 2006 and April 17, 2007, to the extent that Verizon has claims of overcharges for SWAS-DC access services, the parties will have to brief the issue in more depth before we can rule on those claims.

After November 7, 2008, 47 U.S.C. §415(b) applies to Verizon's claims that PAETEC's SWAS-DC rates are unreasonable. Section 415(b) provides, "All complaints against carriers for the

recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section." Those claims are timely because they are compulsory, and PAETEC filed this action on April 17, 2009.

Thus, all of Verizon's claims are timely, with the possible exception of claims for overcharges on the SWAS-DC charges that accrued between August 2, 2006 and April 17, 2007.

### D.  "Deemed Lawful"

 PAETEC claims that Verizon cannot collect a refund on any prior charges because its rates were "deemed lawful" when they were filed in accordance with 47 U.S.C. § 204(a)(3). Section 204(a)(3) states, "[a] local exchange carrier may file with the Commission a new or revised charge, classification, regulation, or practice on a streamlined basis. Any such charge, classification, regulation, or practice shall be deemed lawful and shall be effective 7 days (in the case of a reduction in rates) or 15 days (in the case of an increase in rates) after the date on which it is filed with the Commission unless the Commission takes action under paragraph (1) before the end of that 7-day or 15-day period, as is appropriate." (emphasis added).  "Notice is accomplished by filing the proposed tariff changes with the Commission. Any period of notice specified in this section begins on and includes the date the tariff is

received by the Commission, but does not include the effective date."  47 C.F.R. § 61.58(a)(1).

Although a rate is "legal" when it is filed with the FCC and becomes effective, the rate's legality is not enough to establish its "lawfulness".  To be precise, "[a] carrier charging a merely <u>legal</u> rate may be subject to refund liability if customers can later show that the rate was unreasonable".  <u>ACS of Anchorage, Inc. v. FCC</u>, 290 F.3d 403, 411 (D.C. Cir. 2002)(emphasis in original).  If the FCC declares a rate to be lawful, however, refunds are impermissible as a form of retroactive ratemaking.  <u>Id.</u>  A streamlined tariff that takes effect without prior suspension or investigation is conclusively presumed to be reasonable and thus a lawful tariff, and if a later reexamination shows the tariffs to be unreasonable, the available remedies are prospective only.  <u>Id.</u>

Verizon claims that PAETEC's December 2008 tariff amendment was filed too late to be deemed lawful and in support thereof submits a copy of the tariff received by the FCC bearing a December 10, 2008 date stamp.[16]  Def.'s Mot. For Leave to File a Supplemental Decl. ("Def. Supp."), Ex. B at unnumbered pages 2

---

[16]Verizon also claims that PAETEC's June 22, 2004 tariff amendment should not be deemed lawful because it was filed on only one day's notice, Def.'s Resp. at 25, but we find that the statute of limitations has run on <u>that</u> claim and Verizon may no longer assert it.  Verizon's point that a carrier who "furtively employs improper accounting techniques in a tariff filing" cannot have a deemed lawful tariff is well taken, but filing a tariff amendment on one day's notice does not rise to the level of "improper accounting".  <u>ACS of Anchorage</u>, 290 F.3d at 413.

and 3.  The tariff amendment stipulates, "[t]hese tariff revisions bear an issue date of December 9, 2008 and an effective date of December 24, 2008."  Stip. Ex. 16 at 1.  PAETEC submits three sworn declarations -- one from John T. Ambrosi, Vice-President of Vendor Relations of PAETEC Communications, Inc., and two from Katherine Hoagland, Regulatory and Tariff Analyst at PAETEC's headquarters in Fairport, NY.  Ambrosi declared, under penalty of perjury, that "[a]ll of the PAETEC rates and tariff changes at issue in this case were filed pursuant to Section 204(a)(3) of the Communications Act."  Decl. of John T. Ambrosi in Sup. of Pl.'s Mot. for S.J. at ¶ 14.  Ms. Hoagland declared that she sent the tariff revisions for filing to the FCC's Secretary in Washington, D.C., by commercial overnight mail, and that the letters with the time stamps on them are not the same letters that she sent to the FCC.  Decl. Of Katherine Hoagland at ¶¶ 3-4.

PAETEC responds to Verizon's motion for leave to file a supplemental declaration with its own supplemental declaration from Ms. Hoagland in which she swears that she sent the FCC the December 2008 tariff amendment by overnight mail on December 8, 2008.  PAETEC submits with her declaration a printout from the FedEx Web site showing that it was shipped "standard overnight" on December 8, 2008, somehow bypassing its intended destination, and landing on December 10, 2008, at 9300 E. Hampton Drive.  The

tariff amendment bears the date stamp, "Received & Inspected DEC 10 2008 FCC Mail Room". Def. Supp., Ex. B at unnumbered page 2.

Thus, it appears that the December 2008 tariff amendments are not in compliance with § 204(a)(3) and cannot be deemed lawful. Because PAETEC otherwise complied with § 204(a)(3), the rest of PAETEC's tariff amendments are deemed lawful.

Because we find that PAETEC's SWAS-DC charges beginning on December 24, 2008 are not deemed lawful and are not reasonable, Verizon's claims with regard to charges levied between December 24, 2008 and today can be assessed in their entirety and Verizon is entitled to a refund on those charges.

With regard to the rest of Verizon's claims on charges that were deemed lawful, Verizon argues that because PAETEC charged an amount for SWAS-DC access services in excess of the benchmark, those charges must be subject to mandatory detariffing.[17] In the Seventh Report, the FCC conducted a forbearance analysis for those CLEC interstate access services for which the aggregate charges exceed the benchmark. Seventh Report at ¶¶ 82-87. The FCC stated,

---

[17]Verizon cites to the Memorandum Opinion and Order, <u>Petitions of AT&T Inc. And BellSouth Corp. For Forbearance</u>, 22 FCC Rcd. 18705, ¶ 42 (2007), which states that "[p]recluding [packet-switched broadband services and optical transmission services] tariffs also will restrict AT&T's ability to assert 'deemed lawful' status." This is a different kind of tariff than the one at issue here, and the FCC explicitly limited this ruling to AT&T <u>only</u>. "[W]e decline to extend the forbearance relief granted in this Order to carriers other than AT&T." <u>Id.</u> at ¶ 41.

> [A] CLEC must negotiate with an IXC to
> reach a contractual agreement before it
> can charge that IXC access rates above
> the benchmark.  During the pendency of
> these negotiations, or to the extent the
> parties cannot agree, the CLEC may
> charge the IXC only the benchmark rate.
> In order to implement this approach, we
> adopt mandatory detariffing for access
> rates in excess of the benchmark.  That
> is, we exercise our statutory authority
> to forbear from the enforcement of our
> tariff rules and the Act's tariff
> requirements for CLEC access services
> priced above our benchmark.

Seventh Report at ¶ 82.  The FCC does not explain, however, how "mandatory detariffing" should be implemented or whether it should be implemented in this context.

The selection above from the Seventh Report seems to suggest that mandatory detariffing is something that a CLEC enters into willingly in the interest of trying to negotiate a rate above the benchmark.  There is no indication that the FCC intended to make "mandatory detariffing" a retroactive punishment for charging a rate in excess of the one specified in a tariff.

There are (at least) two things going on here.  The first is that PAETEC charged a rate in excess of the one it defined in its tariff -- specifically, it defined its SWAS-DC rate as not being greater than a certain level, but then charged more than that.  If that rate had still been less than the benchmark, there would be no question that PAETEC's rates would be protected under the "deemed lawful" provision in § 204(a)(3) for most of its charges.  But the second reality is that PAETEC

34

also charged a rate <u>above</u> the benchmark.  What is unclear is
whether the FCC intended to apply retroactive mandatory
detariffing to this situation or merely to forbear enforcing the
tariff rules -- namely, § 204(a)(3)'s "deemed lawful" provision.
At this juncture, we also cannot rule out the possibility that
PAETEC's charges above the benchmark continue to be sheltered
from refund liability by § 204(a)(3).  It is also not out of the
realm of possibility that the FCC could fashion an as-yet
unimagined hybrid of the foregoing.

We will invite the parties to brief this issue and
inform us whether they believe the FCC has squarely addressed
this issue.  If not, they shall advise us whether this is an
issue that should be referred to the FCC's original jurisdiction.


**III.  <u>Conclusion</u>**

We find that PAETEC's SWAS charges comply with the
Benchmark but that its SWAS-DC charges do not.  But there remain
two outstanding issues upon which we will order the parties to
submit briefs: (1) Whether the FCC has clearly stated how
mandatory detariffing applies to CLECs that have charged above
the benchmark rate, whether this requires an invalidation of the
entire tariff at issue or merely exposes CLECs to refund
liability, and whether, if the FCC has not squarely addressed
this issue, it should be referred to the FCC's original

jurisdiction, and (2) whether Verizon's claims for overcharges from the period between August 2, 2006 and April 17, 2007 are barred by the statute of limitations.

We will therefore grant PAETEC's motion for summary judgment with regard to the SWAS charges, but deny it with regard to the SWAS-DC charges. We will deny Verizon's motion for partial summary judgment in part and grant it in part as to the SWAS-DC-related claims from April 17, 2007 to the present.[18]

BY THE COURT:

\_\_\s\Stewart Dalzell

---

[18] Although we have clarified what we could on the record before us, we believe the parties may well best be served by participating in a mediation before our Magistrate Judge, Jacob P. Hart. Thus, before the litigants embark upon the necessary additional briefing, we shall afford them a thirty day "time out" to decide whether they wish to avail themselves of Judge Hart's demonstrated mediation skills.